[Civ. No. 14786.   Second Dist., Div. One.   Sept. 28, 1945.]

MURIEL VIRGINIA STUCKER et al., Respondents, v. RALPH McMAINS et al., Appellants.

Leonard Wilson for Appellants.

Sims, Wallbert & Iasigi for Respondents.

YORK, P. J.—Joseph A. Stucker, a member of the California Highway Patrol, met his death on January 7, 1943, while directing traffic at the intersection of San Fernando Road and Sunland Boulevard, in the city of Los Angeles, when his motorcycle was struck by a 1941 Ford dump truck owned by defendant corporation and being operated by defendant McMains. The surviving wife of decedent, individually and as guardian ad litem for her minor son, by the instant action alleging negligence on the part of defendants, seeks the recovery of damages for loss of services, support, society, companionship and protection. The answer denied the allegations of negligence and set up the special defense of contributory negligence on the part of decedent in the operation of his motorcycle at the time and place of the accident.

At the trial, plaintiffs relied on the theory that decedent, as a member of the California Highway Patrol, was operating an authorized emergency vehicle, as defined by section 44 of the Vehicle Code, and was responding to an emergency call at the time in question, and that defendant McMains by his failure to yield the right of way and otherwise comply with the requirements of section 554 of the Vehicle Code, was guilty of negligence which was the proximate cause of the collision.

The jury returned its verdict in favor of plaintiffs for $20,000, and from the judgment which followed defendants have perfected this appeal.

The evidence adduced at the trial herein reveals that on January 7, 1943, Officers Stucker and Condiff, both members of the California Highway Patrol, were instructed by their superior officer, Sergeant Clarence M. Martin, to escort a group of sixteen trucks, which was the first unit of a convoy of over one hundred army trucks. The two officers mounted their motorcycles at Adams Airport in Roscoe preparatory to leading the first contingent of the convoy over a route laid out to their destination at Camp Haan in Riverside County. They proceeded along Sherman Way and Vineland Avenue to the junction of the latter with Sunland Boulevard; thence east on Sunland, the two officers riding abreast in front of the convoy, until they were about 75 feet west of the intersection of Sunland and San Fernando Road, when Officer Stucker took the lead and entered the intersection about thirty feet in advance of Officer Condiff. Said intersection was about two miles from Adams Airport, their starting point. Officer Condiff testified that when they were about 100 to 150 feet

west of the automatic traffic signal on the southwest corner of said intersection, it was set at "Go," and when they reached a point 70 to 75 feet west thereof, the signal changed to "Stop"; that as he approached the intersection he "observed the traffic and there were several cars stopped on San Fernando Road northbound. I observed no traffic on San Fernando Road southbound at the moment I looked. Officer Stucker entered the intersection and I noticed this truck immediately afterwards"; that the truck was traveling at a speed of 30 to 35 miles per hour, and that Officer Stucker was proceeding into the intersection at a speed of from 10 to 15 miles per hour. Officer Condiff further testified that "the truck ran into the left side" of the motorcycle and that Officer Stucker "was thrown clear up over the left-hand fender and down the side of the truck to the pavement"; that the sirens on both motorcycles were "going full blast" from the time they were 150 feet west of the intersection until the collision occurred, and that the red light on Officer Stucker's motorcycle was still burning after the collision. The accident occurred at 11:30 a. m. on a dry, clear but windy day.

Appellant McMains testified that he was driving a 10-wheel dump truck loaded with 10½ tons of sand southerly on San Fernando Road, that he was traveling in the traffic lane adjacent to the center line at a speed of 20 to 25 miles per hour as he approached the intersection of San Fernando Road and Sunland Boulevard; that when he was 30 feet north of the north curb line of Sunland, he looked to the right (west) and saw no traffic. In reply to the question, "When you looked to the . . . left, did you see any traffic approaching from the east on Sunland?, said witness stated: "Well, I don't remember." He also testified that it was a cold, windy morning and that he had both windows of his driver's cab closed; that when he first saw the signal governing traffic at the intersection in question it was set at "Stop" and he was coasting, waiting for the signal to change; that when he reached a point 75 to 100 feet north of the intersection, the signal changed to "Go"; that as he entered the intersection he saw Officer Stucker coming into the intersection facing to the right but that said officer "never throwed up his hand to me or looked at me," and that he heard the siren and saw the officer at "the same instant."

Appellants urge: "1. That the motorcycle driven and operated by deceased at the time and place in question did not

come within the purview of section 44 of the Vehicle Code in that it was not responding to 'an emergency call', and

"2. Therefore, said deceased could not avail himself of the exceptions and exemptions of section 454, and

"3. Hence, not having the benefit of these two exceptions, he came within the category of any driver upon the road and subject to the rules of the road applicable to all motorists."

On the date of the accident, section 44 of the Vehicle Code read as follows:

"44. 'Authorized Emergency Vehicle.' An 'authorized emergency vehicle' is a vehicle of any of the following types:

"(a) A vehicle publicly owned and operated by a police or fire department or traffic law enforcement officer in responding to emergency calls or in traffic patrol duty.

"(b) A motorcycle, either publicly or privately owned, operated by a police or traffic law enforcement officer in enforcing the provisions of this code. . . ."

Pursuant to section 454, Vehicle Code, the driver of an authorized emergency vehicle shall be exempt from those "regulations contained in Chapters 6 to and including Chapter 13 of Division IX of this code . . ."

"(a) . . . *whenever any said vehicle is being driven in response to an emergency call* or when used in the immediate pursuit of an actual or suspected violator of the law, or when responding to but not returning from a fire alarm.

"(b) . . . Said exemptions shall apply only when the driver of said vehicle sounds a siren as may be reasonably necessary as a warning to others and at night time when the vehicle is equipped with at least one lighted lamp displaying a red light to the front . . . but said exemptions shall not relieve the driver of any said vehicle from the duty to drive with due regard for the safety of all persons using the highway, nor shall the provisions of this section protect any such driver from the consequences of an arbitrary exercise of the privileges declared in this section."

As was stated in the case of *Coltman* v. *City of Beverly Hills*, 40 Cal.App.2d 570, 572 [105 P.2d 153]: "The test for determining whether a publicly owned motor vehicle is at a given time an authorized emergency vehicle responding to an emergency call is not whether an emergency in fact exists at the time but rather whether the vehicle is then being used in responding to an emergency call. Whether the vehicle is being so used depends upon the nature of the call that is re-

ceived and the situation as then presented to the mind of the driver. (*Head* v. *Wilson*, 36 Cal.App.2d 244 [97 P.2d 509].)''

The order to escort the army convoy was given to decedent and Officer Condiff by their superior officer, Sergeant Clarence M. Martin, a member of the California Highway Patrol, who testified that the trucks ''were loaded with personnel and their duffel bags and camping equipment that they usually carry,'' and that he told said officers ''to take the first unit of this serial and proceed over the route laid out, to their destination,'' which was Camp Haan, located in Riverside County, a distance of over 60 miles from the starting point.

The trial court instructed the jury ''that on May 27, 1941, the President of the United States proclaimed that an unlimited national emergency existed in the United States and that on the date of the accident here in question said unlimited national emergency continued to exist.

''This fact of which the court takes judicial notice, is now in evidence to be considered by you in arriving at your verdict.''

At the time here in question, it was a matter of common knowledge that this country was engaged in a world conflict; that the coastal territory of California had been declared a theatre of operation and an army training center; that the army was engaged in training thousands of soldiers in this district and that Camp Haan was a training camp; that the army possessed thousands of trucks which it used on the public highways to transport soldiers and equipment from point to point; that when the army moved large convoys of trucks loaded with personnel and equipment over the highway system of the state, speed and safety were necessary to insure their expeditious arrival at a particular destination; that an army convoy of trucks could not travel with speed and safety to itself or to the public without a police escort; that on January 7th darkness descends much earlier than later in the year, and that Camp Haan was located some 60 miles from Adams Airport. With these facts in mind, it would appear that in considering the evidence that decedent and Officer Condiff were given instructions by their superior officer to escort the first unit of the convoy of 100 trucks loaded with men and equipment from Adams Airport to Camp Haan, the jury was justified in concluding that such movement was being made in connection with the defense of this country, and that speedy and unimpeded progress was required in order

that the convoy should arrive at its destination before sundown. Hence, that a combination of circumstances existed which called for immediate action on the part of the officers, who were instructed to escort the convoy, and from which circumstances an inference arose that the officers were operating emergency vehicles in response to an emergency call. The movement of men and equipment during the national war emergency was of sufficient importance to dwarf into insignificance those cases wherein it has been held that fire fighting apparatus, ambulances and police cars were emergency vehicles responding to emergency calls. (See *Raynor* v. *City of Arcata,* 11 Cal.2d 113 [77 P.2d 1054]; *Lucas* v. *City of Los Angeles,* 10 Cal.2d 476 [75 P.2d 599]; *Coltman* v. *City of Beverly Hills,* 40 Cal.App.2d 570 [105 P.2d 153], and cases therein cited; also, Veh. Code, § 44.)

Contrary to appellants' contention, it was conclusively established that the motorcycles being operated by decedent and Officer Condiff were sounding their sirens as they entered the intersection and were displaying red lights in conformity with the provisions of section 454 of the Vehicle Code. While the witnesses McMains and Simmons testified that they did not hear the sirens, their testimony also discloses that they had their cab windows closed and therefore were unable to hear that which they should have heard.

An examination of the record herein reveals that the cause was fairly tried; that the jury was adequately instructed and that the evidence supports the verdict and the judgment.

For the reasons stated, the judgment is affirmed.

White, J., concurred.

Doran, J., dissented.